UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| YOLANDA BEASLEY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 4:02CV00823 ERW |
| ) | |
| ROBERT PIEKUTOWSKI, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court upon Defendant Keith Kierzkowski's Motion for Summary Judgment [doc. #151].

**I. BACKGROUND**

On June 12, 2000, St. Louis County Multi-Jurisdictional Drug Task Force ("Task Force") made plans to arrest Earl Murray. On two prior occasions, Mr. Murray had sold crack cocaine to an informant working with the Task Force. Murray had two prior felony drug convictions and a prior conviction for a felon in possession of a firearm. On June 12, 2000, the informant made arrangements to purchase crack cocaine from Murray at an agreed-upon location, and the Task Force planned to arrest Murray at that location.

During the afternoon of June 12, 2000, at the request of the Task Force, the St. Louis Division of the Drug Enforcement Administration ("DEA") agreed to provide assistance in the arrest. In total, seven members of the Task Force and six DEA agents planned to participate in the arrest. The participants had an operation briefing, wherein, two DEA Ford Explorers were designated as the arrest vehicles. After the initial briefing, the location of the planned arrest changed from a Phillips 66 gas station to a Jack-In-The-Box restaurant.

1

Defendant Kierzkowski is one of the DEA agents who participated in the arrest operation. Kierzkowski was provided information relating to the ongoing investigation of Murray during telephone conversations and the operation briefings that afternoon. He was shown a picture of Murray, and he learned about Murray's criminal record, including the firearms violation. Kierzkowski was more concerned about the danger of the arrest operation after the location changed to Jack-In-The-Box. At the second briefing, the officers discussed changes in plans related to the arrest taking place in a different location. The officers planned to use the Explorers to block Murray's vehicle in the parking lot. Kierzkowski and the other officers in the grey Explorer driven by Kierzkowski, did not know exactly where Murray would park. It had been decided earlier that Kierzkowski and the other officers in the grey Explorer would make the arrest.

At approximately 4:30 p.m. on the afternoon of June 12, 2000, Murray's vehicle, a red Ford Escort, under surveillance, entered the Jack-In-The-Box parking lot. He parked in a spot near a raised concrete island on which there was a pillar, rocks and bushes. There was a passenger in the car with Murray who was later identified as Ronald Beasley. Shortly after Murray parked his vehicle, the arrest signal was given, and the Explorers pulled into the Jack-In-The-Box parking lot. Kierzkowski positioned his grey Explorer in front of the Escort at an angle. The other arrest vehicle, a burgundy DEA Explorer, parked directly behind Murray's Escort. Officers Kierzkowski, Piekutowski and Baratti exited the grey Explorer. They wore clothing identifying themselves as "police," and the officers made verbal announcements identifying themselves as "police," ordering Murray and his passenger to show their hands. Rather than raising his hands, the passenger reached down below the dashboard to the floor area under his seat. Initially, the record supports expressed concern by the officers about the passenger reaching under his seat, perhaps to retrieve a weapon. Kierkowski and Piekutowski immediately attempted to get to the passenger side of the Escort. At that time, Murray turned around, facing the rear of

2

his car, and accelerated rapidly in reverse. He rammed the burgundy Explorer parked behind the Escort. Kierzkowski testified that it was a "violent crash." When the Escort hit the Explorer parked behind it, two officers in the Explorer were knocked from the vehicle onto the ground. One officer landed on the ground directly behind the Escort. The officers behind the Escort could see smoke coming from the tires and hear the tires screeching. After hitting the burgundy Explorer, Murray continued to accelerate rearward at a high engine revolution, all the while turning the steering wheel of the Escort to the left. As Murray turned the steering wheel to the left, the front of the Escort turned and was pointed directly at the location of Officers Kierzkowski and Piekutowski who were located between five and ten feet in front of the Escort. Both officers have testified in depositions that they considered the vehicle a threat to their safety and to the safety of the other officers.

At that time, Kierzkowski saw Murray turn his head forward again, look directly at him, and reach down toward the gear shift located in the console of the car. Kierzkowski believed the Escort then began to move directly at him.[1] Kierzkowski immediately fired eleven times directly at Murray. He said that he stopped firing when the vehicle was no longer a threat. Officer Piekutowski, believing he was about to die, also fired at Murray ten times. Kierzkowski estimates that only five to fifteen seconds passed between the time he parked the grey Explorer and the gunfire ceased.

Both Murray and his passenger were pronounced dead at the scene. A subsequent autopsy of Murray revealed that he was struck with twenty-five bullet projectiles. Among other

---

[1] Defendant Kierzkowski filed a motion in limine asking that the Court not consider the Report of the Department of Justice Concerning the Deaths of Earl Murray and Ronald Beasley on June 12, 2000 [doc. # 153]. In accordance with the Order entered on this same date, the Report is inadmissible and the evidence indicating that Murray's Escort did not move forward during the incident will not be considered. See Firemen's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993) ("The district court must base its determination regarding the presence or absence of material issue of factual dispute on evidence that will be admissible at trial.")

injuries, he sustained gunshot wounds to his right thumb, right little finger, right wrist and right hand. After the shooting, one of the officers found the gear shift of the Escort jammed between neutral and drive, and he had to step on the brake and depress the button on the gear shift in order to move the gear shift into park. During a search of the vehicle, St. Louis County Technicians found 3.17 grams of crack cocaine under the driver's side seat and 0.13 grams of black tar heroin beneath the passenger seat.

Mr. Murray's widow and children filed suit against Agent Kierzkowski on September 26, 2002, seeking damages pursuant to 42 U.S.C. § 1983. Plaintiffs argue that Agent Kierzkowski used excessive force in effectuating the arrest of Earl Murray in violation of Mr. Murray's Fourth Amendment right to be free from unreasonable seizures.

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Crumley v. City of St. Paul, 324 F.3d 1003, 1006 (8th Cir. 2003). The United States Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 1).

"'By its terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment; the requirement is that there be no *genuine* issue of *material* fact.'" Hufsmith v. Weaver, 817 F.2d 455, 460 n.7 (8th Cir. 1987) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis added by Supreme Court)). Material facts are "those 'that might affect the outcome of the suit under governing law.'" Id. (quoting Anderson, 477 U.S. at 247-48).

Summary judgment will be denied due to a material issue of genuine fact if "the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." Crumley, 324 F.3d at 1006. Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23, quoted in St. Jude Med., Inc. v. Lifecare Intern., Inc., 250 F.3d 587, 595 (8th Cir. 2001).

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. Crumley, 324 F.3d at 1006 (citing Lynn v. Deaconess Med. Ctr.-W. Campus, 160 F.3d 484, 487 (8th Cir. 1998)). The burden then shifts to the non-moving party who must set forth specific evidence showing that there is a genuine dispute as to material issues. Anderson, 477 U.S. at 249. To meet its burden, the non-moving party may not rest on the pleadings alone and must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.

In analyzing summary judgment motions, the court must view the evidence in the light most favorable to the non-moving party. Crumley, 324 F.3d at 1008. The non-moving party is given the benefit of any inferences that can logically be drawn from those facts. Matsushita, 475 U.S. at 586. The court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." Kampouris v. St. Louis Symphony Soc., 210 F.3d 845, 847 (8th Cir. 2000). The court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." Id.

**III. DISCUSSION**

Agent Kierzkowski argues that the Court should grant summary judgment in his favor on Plaintiffs' excessive force claim because he is shielded from liability by the doctrine of qualified immunity. In Harlow v. Fitzgerald, the Supreme Court established that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818 (1982). "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." Brosseau v. Haugen, 125 S.Ct. 596, 599 (2004) (qualified immunity protects actions that fall in the "hazy border between excessive and acceptable force"); Saucier v. Katz, 533 U.S. 194, 205 (2001) ("[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct"); Hunter v. Bryant, 502 U.S. 224, 229 (1991) ("qualified immunity standard 'gives ample room for mistaken judgments'"); Anderson v. Creighton, 483 U.S. 635, 640 (1987) (unlawfulness of actions must be apparent for qualified immunity not to apply). The purpose of providing government officials with qualified immunity is so that "officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law." Anderson, 483 U.S. at 646.

The Supreme Court explained that courts should undertake a two-part inquiry in order to determine whether an official is entitled to qualified immunity. The first question is whether the plaintiffs' allegations, if true, establish a constitutional violation. Brosseau, 125 S.Ct. at 598; Saucier, 533 U.S. at 201. If no constitutional right would have been violated were the allegations established, plaintiffs are not entitled to damages, and no additional analysis is required. Saucier, 533 U.S. at 201; Lockridge v. Bd. of Trs. of the Univ. of Ark., 315 F.3d 1005, 1008 (8th Cir. 2003). On the other hand, if a violation can be proved, the second step is to ask whether, viewing the facts in a light most favorable to the party asserting the violation, the right was clearly

established at the time of the official's conduct. Brosseau, 125 S.Ct. at 599; Craighead v. Lee, 399 F.3d 954, 961 (8th Cir. 2005). The right must exist "in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640; see also, Brosseau, 125 S.Ct. at 599; Saucier, 533 U.S. at 202.

In Count One, the Plaintiffs argue that Kierzkowski violated Mr. Murray's constitutional right to be free from unreasonable seizures by acting in an unconstitutionally excessive manner when he used deadly force against Mr. Murray. The Eighth Circuit has held that a Fourth Amendment seizure occurs when an officer fatally shoots a fleeing suspect. Cole v. Bone, 993 F.2d 1328, 1332-33) (8th Cir. 1993). Excessive force claims under the Fourth Amendment are analyzed under a "reasonableness" standard. Graham v. O'Connor, 490 U.S. 386, 395 (1989); Craighead, 399 F.3d at 961; Schultz v. Long, 44 F.3d 643, 649 (8th Cir. 1995) ("The Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within a range of conduct which is objectively 'reasonable' under the Fourth Amendment").

"It is well settled that police officers may use some degree of force in effecting a lawful arrest." Krueger v. Fuhr, 991 F.2d 435, 438 (8th Cir. 1993). The test is whether an officer's actions are "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." Graham, 490 U.S. at 397. The reasonableness inquiry must allow for the fact that "police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Id. ("[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"); Krueger, 991 F.2d at 439 ("An erroneous

7

perception or belief does not violate the Fourth Amendment if such perception or belief is objectively reasonable."). The Supreme Court further observed in Graham that the reasonableness test is "not capable of precise definition or mechanical application," and "requires careful attention to the facts and circumstances of each particular case." Id. at 396. Specifically, the Court shall analyze all the facts, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.

Additionally, the court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Tennessee v. Garner, 471 U.S. 1, 8 (1985) (quoting United States v. Place, 462 U.S. 696, 703 (1983)). "The intrusiveness of a seizure by means of deadly force is unmatched." Id. at 9. The Supreme Court held that the use of deadly force is not justified to prevent the escape of a suspect that poses no immediate threat to officers or others in the area. Id. at 11. However,

> [w]here an officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Id. at 11-12; see also Hernandez v. Jarman, 340 F.3d 617, 622 (8th Cir. 2003); Schultz, 44 F.3d at 649.

To prove that an officer violated a clearly established right by virtue of using deadly force, the plaintiff must demonstrate that in prior cases with similar facts and circumstances, courts found the government official's conduct was in violation of a constitutional right. Brosseau, 125 S.Ct. at 599. Graham and Garner "are cast at a high level of generality," and

analysis based on the standards pronounced in those cases is insufficient unless the constitutional violation is "obvious." Id.

> [T]he preexisting law must give real notice of practical value to government officials, considering the specific circumstances confronting them, and not just talk of some generalized, abstract intellectual concept. Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases. Unless a government agent's act is so obviously wrong, in light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit.

Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002) (internal quotations and citations omitted); see also, Brosseau, 125 S.Ct. at 600 (the court found no analogous cases showed right was "clearly established").

In deciding whether Kierzkowski is lawfully protected from liability by the doctrine of qualified immunity, the Court must first determine whether, if true, Plaintiffs' allegations establish a constitutional violation. Plaintiffs argue Kierzkowski violated Murray's right under the Fourth Amendment protections against unreasonable seizures. Clearly, Murray was seized when Kierzkowski and Piekutowski used deadly force against him in the Jack-In-The-Box parking lot. See Cole, 993 F.2d at 1332-33. However, because officers do have the authority to use some degree of force in making an arrest, an officer's use of deadly force will establish a constitutional violation only if the amount of force used under the circumstances was unreasonable. Krueger, 991 F.2d at 438.

Kierzkowski estimates that the incident, from the time he got out of the grey Explorer until the shooting stopped, took five to fifteen seconds. Kierzkowski shouted "police" and told Murray and his passenger to raise their hands, but instead of complying, the passenger in the car leaned forward and reached beneath his seat. The officers did not know if the men in the car were armed, but Kierzkowski did know that Murray's criminal history included a firearms violation. In the five to fifteen seconds that elapsed, Kierzkowski says that he made a split-second decision to

9

fire his weapon at Murray when he believed the Escort began moving forward, toward him. He was between five and ten feet away from the Escort standing directly in its path.

Plaintiffs claim that summary judgment is inappropriate because questions of fact exist relating to whether Kierzkowski's use of deadly force was reasonable. First, Plaintiffs argue that Murray could not have sustained multiple gunshot wounds to his right hand if he was really putting the car into drive as the officers claim. It is clear that the car crashed violently into the burgundy Explorer, in a reverse motion, and when the shooting ended, the gear shift was between neutral and drive, so Murray had his right hand on the gear shift after the Escort was in reverse gear.

Plaintiffs also argue that the physical evidence shows the Escort did not move in a forward direction toward Kierzkowski. Assuming arguendo that the Escort did not move forward, Kierzkowski's perception was that Murray was shifting gears, looking at him, and intended to run him over. At that time, Kierzkowski was only five to ten feet in front of the Escort.

Plaintiffs do not dispute that the officers *perceived* the Escort as moving forward. All of the officers at the scene believe the Escort did move forward. In fact, the driver of the burgundy Explorer felt the Explorer being pulled forward by the Escort; however, he does not know how far either vehicle moved because smoke and rubber debris from the Escort's tires was hitting his windshield. One of the officers that was thrown on the ground when the Escort rammed the Explorer claims that he saw the front, passenger-side tire spinning forward from where he was on the ground.

The Court understands how Kierzkowski could have perceived, even if the perception is mistaken, the Escort to be moving forward. After Murray rammed the burgundy Explorer with his car, he continued to accelerate in reverse, presumably in an effort to move the burgundy Explorer backwards so he could drive from between the two Explorers. The Escort was rocking

forward and backward. The tires were squealing and smoking. It was then, according to Kierzkowski, that Murray turned around in his seat to face forward, looked directly at Kierzkowski, and reached for the gear shift. Murray's right hand was clearly not on the gear shift the entire time Kierzkowski and Piekutowski were shooting at him, because his hand was in the line of fire at some point as evidenced by the severe wounds to his right hand and wrist.

If a suspect attempts to run over an officer with an automobile, that automobile becomes a deadly weapon. See Harris v. Coweta County, 406 F.3d 1307, 1315 (11th Cir. 2005); Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992). Both Kierzkowski and Piekutowski claim that they considered Murray's vehicle a threat. Although Murray was later determined to have been unarmed, he did use the Escort to threaten the safety of the officers on the ground around the Escort. As the Supreme Court opined in Garner, if a suspect "poses a significant threat of death or serious physical injury to the officers," it is not unreasonable to use deadly force. 471 U.S. at 3.

In Hernandez v. Jarman, a suspect led police on a lengthy high speed chase that ended on a small path leading to a pasture. 340 F.3d at 620-21. Upon reaching the pasture, the suspect turned his vehicle around and came back on the path in the other direction, running head-on into a police car that had been pursuing him. Id. at 621. The confrontation ended with the suspect being shot and killed by one of the officers. Id. The mother of the deceased suspect brought an action claiming the officers used excessive force. Id. at 621. The district court denied the defendant's motion for summary judgment based on qualified immunity because of material facts in dispute. The district court found that it was unclear (1) whether the suspect actually intended to collide with the police car, (2) what took place in the pasture prior to the shooting, and (3) whether the suspect would have been able to operate his vehicle in an attempt to escape after the collision. Id. at 622-24. The Eighth Circuit reversed the district court, holding that the suspect's "actual intent is irrelevant. Instead, our inquiry concerns what a reasonable officer could conclude

11

[the suspect's] intentions were at that moment." Id. at 624. The Court based it decision on the rationale that the officers "had probable cause to believe [the suspect] posed an imminent threat of serious physical harm to himself and to others as evidenced by [the suspect] driving head-on into [the officer's] vehicle." Id.

Analysis of the Graham factors show that Kierzkowski's use of force was reasonable. 490 U.S. at 396. First, the severity of the crime was moderate. Murray had two prior felony drug convictions, and the buy-bust on June 12, 2000, was his third law enforcement-monitored sale to the confidential informant. Murray did pose an immediate threat to the safety of Kierzkowski and the other officers. Murray used his Escort as a weapon, he rammed the burgundy Explorer positioned behind him and, at a minimum, attempted to put the Escort into "drive" when two officers were located five to ten feet directly in front of the Escort. Finally, Murray actively resisted arrest and attempted to evade the arrest by flight. Neither Murray, nor the passenger in the Escort, raised their hands when told to do so by the officers. Instead, their hands remained under the dash, and Murray attempted to ram the burgundy Explorer behind him so that he could get out from between the two Explorers. Plaintiffs have not established that Kierzkowski's actions were unreasonable under the facts of the case.

Plaintiffs also argue that Kierzkowski could have continued running to the other side of the car instead of stopping in front of it when the car rammed the Explorer. Plaintiffs suggest that Kierzkowski could have abated any threat from the Escort by getting to the other side of the vehicle before it was able to move forward. Kierzkowski testified that he could not get around to the other side of the car in time. Furthermore, an officer does not have to determine if there are alternatives available before using force to effect an arrest. See Schultz, 44 F.3d at 649; Drewitt v. Pratt, 999 F.2d 774, 778 (4th Cir. 1993) (holding that police officer's ability to jump out of way of victim's vehicle was not material to officer's decision to shoot). The fact that

Kierzkowski stopped in front of the vehicle and did not continue running does not make his use of force against Murray unreasonable.

## IV. CONCLUSION

Plaintiffs have failed to show that Kierzkowski's use of force violated Murray's constitutional right to be free from unreasonable seizures. For that reason, Kierzkowski is entitled to qualified immunity.[2]

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Keith Kierzkowski's Motion for Summary Judgment [doc. #151] is **GRANTED**.

An appropriate order of dismissal will accompany this Order.

Dated this 21st day of June, 2005.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

---

[2] The Court notes that because there was no constitutional violation in this case, it is unnecessary to analyze whether the particular constitutional right was clearly established. See Saucier, 533 U.S. at 201.